# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JANEKA PEACE-WICKHAM, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C. A. No. 07-598-MPT |
| | : | |
| JAMES WALLS, in his individual capacity, | : | |
| GEORGE IANNETTA, in his individual | : | |
| capacity, and DELAWARE RIVER & BAY | : | |
| AUTHORITY, | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM OPINION</u>

Jeffrey K. Martin, Martin & Associates, P.A., 1508 Pennsylvania Avenue, Wilmington, DE 19806.
James P. Hall, Phillips, Goldman & Spence, P.A., 1200 North Broom Street, Wilmington, DE 19806.
Counsel for Plaintiff Janeka Peace-Wickham.

Adria Benner Martinelli, Young, Conaway, Stargatt & Taylor, The Brandywine Building, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, DE 19899-0391.
Counsel for Defendant Delaware River & Bay Authority and Defendant James Walls.

Kevin J. Connors, Marshall, Dennehey, Warner, Coleman & Goggin, 1220 N. Market St., Suite 500, P.O. Box 8888, Wilmington, DE 19899.
Adria Benner Martinelli, Young, Conaway, Stargatt & Taylor, The Brandywine Building, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, DE 19899-0391.
Counsel for Defendant George Iannetta.

Wilmington, DE
November 23, 2009

**Thynge, U.S. Magistrate Judge**

## I. INTRODUCTION

This is an employment discrimination case. Plaintiff Janeka Peace-Wickham

claims against defendant Delaware River and Bay Authority ("DRBA") for Title VII

discrimination and Title VII failure to promote under 42 U.S.C. § 2000e-2(a), Title VII

retaliation under 42 U.S.C. § 2000e-3(a), and discrimination under 42 U.S.C. § 1981.

Peace also claims discrimination against defendant James Walls in his individual

capacity under 42 U.S.C. § 1983.[1] On August 17, 2009, defendants moved for

summary judgment on all counts. For the reasons stated below, this court grants

defendants' motions in full.

## II. BACKGROUND[2]

Peace began working for the DRBA on December 12, 2005 as the Food and

Retail Supervisor at the Delaware Memorial Bridge Facility Café.[3] Peace remains in

that position today. Her job duties include ordering and purchasing inventory,

supervising staff, ensuring timely food service, cooking and cashiering when necessary,

---

[1] Peace's claim against George Iannetta in his individual capacity under 42 U.S.C. § 1983 was dismissed with prejudice pursuant to a stipulation by the parties on September 24, 2009. D.I. 76. Peace also voluntarily dismissed her claim of a breach of the covenant of good faith and fair dealing on August 17, 2009. D.I. 60.

[2] Throughout this document, this court has adopted without attribution language suggested by either side in the dispute. In all such instances, the language in question has become that of this court, based upon review of the evidence and the law. Unless otherwise noted, these facts take as true all allegations of the non-movant that conflict with those of the movant and resolve all doubts against the movant.

[3] The DRBA was created by an interstate compact between Delaware and New Jersey to advance economic development and improve traffic flow between the two states. Along with the Delaware Memorial Twin Bridges, the DRBA also operates a number of ferry crossings and airport facilities.

and assisting the Food and Retail Manager.  Until May 1, 2007, Juanita Molletta (black female) worked in the Manager position.  Molletta reported to Food and Retail Superintendent George Iannetta (white male), who oversaw all food and retail operations at the DRBA until his resignation on July 3, 2007.[4]

Peace replaced former Café supervisor Susan Clayton (white female), whom the DRBA fired for organizing a work stoppage.[5]  Clayton was upset that the DRBA hired Molletta (an outside candidate) for a vacant Manager position instead of promoting her, allegedly telling Molletta she "had no business getting that job."[6]  Peace felt that the boycott fanned racial tensions at the Café and that many white workers were disobedient and resistant to her instructions as a result.  She raised these concerns with Iannetta, who responded that she and Molletta were the Café's first black supervisors and that the other employees were "not used to the change."[7]

Within the first two weeks of Peace's employment, the Café's regular cook, Lorraine Rathof, went on medical leave.  In her absence Peace was assigned to cooking duties on a full-time basis.  Molletta and Anna Cheers (black female) were selected to help.[8]  This arrangement lasted approximately three months, during which the three were too busy to take their allotted breaks.[9]  Peace complained to the DRBA's Equal Employment Officer, Consuela Petty-Judkins (black female), that full-time cooking was outside her responsibility as a supervisor.  After consulting with Trudy Spence-

---

[4] D.I. 66 at 3 n.6.
[5] D.I. 67 at A87.
[6] D.I. 67 at A307.
[7] D.I. 68 at A28.
[8] D.I. 68 at A50-52.
[9] *Id.*

Parker (the DRBA's former Chief of Human Resources) and DRBA Chief Operations Officer Jim Walls (white male), Petty-Judkins authorized Peace to bring in additional temporary help.[10]  Despite this action, the three remained too busy to take regular breaks.[11]  When Iannetta learned of the complaint, he pulled Peace and Molletta aside and "hollered" at them for not handling the issue themselves.[12]

On February 9, 2006, seasonal Food Service worker Amy Moriarty (white female) filed an internal harassment complaint against Peace.  Moriarty claimed that Peace threatened to "beat [her] white ass down."[13]  Moriarty took a number of sick days immediately following the incident, and was placed in a different work location when she returned.[14]  Her complaint was dismissed in late February for lack of evidence.  Peace lodged her own internal complaint on February 23, 2006 denying Moriarty's allegations and claiming Moriarty made racially charged comments about her to coworkers.

The DRBA took a number of actions in response to the boycott and related racial tension at the Café.  For about a year beginning in April 2006, Walls held regular meetings with Molletta and Iannetta during which he reviewed the performance, complaints, and interactions of every Café employee.[15]  The DRBA brought in third-party counseling for Iannetta, Peace, and Molletta as well.[16]  Susan Polak, a Human Resources Generalist, was also assigned to provide onsite support to Molletta and

---

[10]  D.I. 68 at 3.
[11]  D.I. 68 at 53.
[12]  *Id.*
[13]  D.I. 67 at A91.
[14]  *Id.* at A92-93.
[15]  *Id.* at A282.
[16]  *Id.* at A125.

Peace, and consulted with both on a regular basis regarding any ongoing problems.[17]

Peace was further reminded that Petty-Judkins was available as a resource.[18]

Despite these actions, other incidents occurred while Peace waited for the DRBA to formally address her complaint against Moriarty.  Molletta testified that she heard a white DRBA employee make statements about "lynching" directed at Peace in the Café.[19]  Peace also overheard two DRBA workers who had placed an order with another black employee comment that "back in the day, down South, blacks would have been hung for things like this."[20]  Peace reported this comment to Iannetta and Walls on April 7, 2006.  Walls asked Peace if she could provide any information to help identify the workers, but she could not.[21]  Walls performed no further investigation, and Peace did not notify Walls when she saw one of the individuals again.[22]

About the same time, a white DRBA police officer named Denise Wise told Peace that the Café had "changed" since Peace's arrival and that she wanted Clayton back as Supervisor.[23]  Peace considered these comments racially motivated because she had previously heard that Wise thought there were too many blacks working in the Café.[24]  Peace reported these comments to, among others, Iannetta and Jeff Jannaman (Wise's supervisor).  Jannaman counseled Wise about the sensitivity surrounding

---

[17]  *Id.* at A329-30.
[18]  *Id.* at A327-28.
[19]  D.I. 68 at A158.
[20]  *Id.* at A23.
[21]  *Id.* at A25.
[22]  D.I. 67 at A229-30.
[23]  D.I. 68 at A44.
[24]  Wise related this sentiment to Candace Wallace (white female), who evidently shared Wise's view.  Anna Cheers, a temporary worker, informed Peace of the comments.  D.I. 68 at A153.

Clayton and told her the incident would be included in her upcoming annual performance review.[25]  He also asked Wise to return to the Café to apologize, although she never did.  Peace reported no further altercations with Wise.

In another incident, Brenda Kennedy (a white DRBA toll counter and personal friend of Moriarty) wadded up her Café receipt and threw it at Peace's head.[26]  Peace complained to Iannetta and others.  Iannetta told Peace he would take care of it, but Kennedy later threw another receipt at Peace.[27]  Peace again reported Kennedy, after which Iannetta stated he spoke to Kennedy and made it "very clear" that such conduct would not be tolerated.[28]

On May 3, 2006, Peace filed a Charge of Discrimination against the DRBA with the Delaware Department of Labor (DDOL) alleging a racially hostile work environment.[29]  Peace specifically objected that, while Moriarty's accusations were addressed within the month, no action had yet been taken on her complaint.  She also took issue with being required to perform "lesser duties on occasion" when her white subordinate employees were removed or transferred.[30]  The DDOL issued a Right to Sue Notice in connection with this charge on December 26, 2006.[31]

On May 19, 2006, following her own investigation, Petty-Judkins forwarded Peace's complaint to the DRBA's Discrimination/Harassment Complaint Committee.[32]

---

[25] D.I. 67 at A114-15.
[26] D.I. 68 at A46.
[27] *Id.* at A47.
[28] D.I. 67 at A322.
[29] D.I. 68 at A5.
[30] *Id.*
[31] *Id.* at A6.
[32] D.I. 67 at A110, A122.

The Committee initially arranged to interview Peace on May 24, but Peace called in sick that day.[33]  The meeting was instead held on June 8, 2006, the earliest date all members could reconvene.[34]  By that time Moriarty had resigned due to excessive absenteeism.[35]  At the June 8 meeting Peace read a prepared statement, provided additional notes, and discussed her recent episodes with coworkers at the Café.  The Committee did not offer a formal opinion or recommendation because of Peace's "reluctance" to amend her original complaint or pursue the investigation further.[36]  It did note, however, that the complaint as written did not provide "any specific events or complaints that the Committee collectively feels qualify as a violation under the DRBA Harassment Policy."[37]  Peace denies this characterization of the meeting, and maintains she was willing to cooperate with any additional Committee action.[38]

Peace shared these concerns with Walls, who asked her what she would like to see come from her complaint.  Peace replied that she wanted anti-harassment signs posted around the DRBA building as well as diversity training classes for DRBA employees.[39]  The DRBA thereafter arranged mandatory diversity and harassment training for all employees.  Diversity training began in the summer of 2006 and was completed by January of 2007.[40]  Harassment training–which included a discussion of

---

[33]  *Id.* at A122, A218.
[34]  *Id.* at A122.
[35]  *Id.* at A102-04; A112.
[36]  *Id.* at A123.
[37]  *Id.*
[38]  D.I. 68 at A86.
[39]  D.I. 1 at 6.
[40]  D.I. 67 at A287.

racial harassment–began in December 2006 and was completed by July 2008.[41]  Signs
alerting employees to the DRBA's Equal Oportunity/Anti-Harassment Policy had
previously been posted in common areas in the building where Peace worked.[42]

Peace continued to have trouble with DRBA employees after the Committee
meeting.  Peace and Molletta both stated that Bill Gilbert (a white Café greeter/stock
worker under Peace's supervision) generally acted rude, disrespectful and defiant
toward Peace.[43]  On one occasion in January 2007, Gilbert cleared every table in the
Café except the one where Peace and Sandra McKinney (another black DRBA
employee) were eating.[44]  McKinney filed an internal complaint against Gilbert, after
which Walls removed him from the Café schedule and transferred him to another
department.[45]

In February 2007, Molletta wrote an Employee Performance Record (EPR) for
Peace relating to a $68.14 shortage in bank deposits while Peace was working as a
cashier.[46]  The missing amount was found the next day in a cash bag inside the
cashier's drawer.[47]  The EPR was not signed by either Molletta or Peace and did not
become part of Peace's official personnel file.[48]

Reacting to perceived deficiencies in its handling of employee complaints, the

---

[41] *Id.* at A350-51.
[42] *Id.* at A351, A366.
[43] D.I. 68 at A59; A158.
[44] *Id.* at A59-62.
[45] *Id.* at A369.
[46] D.I. 67 at A136.
[47] D.I. 68 at A114-17.
[48] D.I. 67 at A137; A369.

DRBA restructured its Equal Employment Office investigation policy in February 2007.[49] The changes eliminated committees comprised of senior-level managers, whose conflicting schedules often led to significant delay before a formal hearing.  The new policy further mandated a final determination on all complaints within 25 business days. A human resources representative met with all DRBA employees in small groups to explain the revisions and answer questions.[50]  Peace received a copy of the new policy on March 13, 2007.[51]

On April 9, 2007, following her morning break, Peace returned to the Café to find an anonymous sign posted on the door reading "free at last, free at last, thank God we are free at last."[52]  The sign clearly referenced a famous quote by civil rights leader Dr. Martin Luther King.  Peace was the only black employee on duty at the time, and read the sign as a personal attack.  The next day, Walls and Spence-Parker met with Petty-Judkins after Peace reported the incident.[53]  When asked why she did not remove the sign when she noticed it, Peace reportedly replied that "she didn't put it there [and] she wasn't taking it down."[54]  Petty-Judkins went to the Café to gather preliminary information on April 10, and conducted several follow-up interviews on April 13.[55]  In her April 13 report, Petty-Judkins was unable to identify the source of the sign but expressed concern that minority employees at the DRBA viewed it as derogatory.[56]

---

[49] D.I. 67 at A127-30.
[50] *Id.* at A351.
[51] *Id.* at A138.
[52] D.I. 68 at A66.
[53] D.I. 67 at A140.
[54] *Id.*
[55] *Id.* at A141-42.
[56] *Id.* at A142.

On May 1, 2007, Molletta resigned from the DRBA, leaving the Food and Retail Manager position temporarily vacant.[57]  Although Peace had been assigned to full-time cashiering since February 2007, she claims to have unofficially assumed Molletta's managerial responsibilities.  Specifically, she testified that Walls (who was temporarily assigned to oversee Café operations in Molletta's absence) told her "he did not know anything about the business, and to do what [she] needed to do to keep the Café running."[58]  In these situations, the DRBA customarily placed the next highest ranking or most qualified internal employee in an "acting" position until the vacancy could be permanently filled.[59]  As the most senior employee below Molletta, Peace asked Walls to name her acting Food and Retail Manager in a meeting on May 3, 2007.[60]  She renewed this request multiple times thereafter.  Walls responded that the DRBA would "move forward in another direction" even though Peggy Mitchell, the DRBA's Food Service Manager, told him that Peace could handle the job with some extra training.[61]

On June 4, 2007, Peace filed a second Charge of Discrimination with the DDOL asserting retaliation for her previous complaints in the form of demotions, write-ups, restricted duties, denied promotions, and harassment.[62]  Peace cited her alleged violation of the cash handling policy (resulting in the February 2007 EPR, which she claims never to have seen or heard of) as pretext for the DRBA's actions.[63]  The DDOL

---

[57]  *Id.* at A313.
[58]  D.I. 68 at A92.
[59]  *Id.* at A173-74.
[60]  *Id.*
[61]  *Id.* at A174; A144.
[62]  *Id.* at A8-9.
[63]  *Id.*

dismissed the charge without making a finding, but issued a Right to Sue Notice based on a determination that no further benefit could be derived from the administrative process.[64]

Walls maintains he rejected Peace's requests because the Café had serious financial problems (such as inventory management, portion control, pricing analysis, waste tracking, and manpower utilization) that Peace, who lacked retail restaurant experience, was unqualified to manage.[65]  He also points to a number of concerns with Peace's work performance, including:  (1) she failed to address employee performance issues when she witnessed them; (2) she was counseled regarding cash missing from the register; (3) she took offense, but did not remove the "free at last" sign; and (4) she was frequently absent without notice during the workday.[66]  The acting Manager position was instead given to Michael Cattalo, an outside employee from a temporary agency with significant experience managing public bars and restaurants.

On August 9, 2007, Peace filed an internal grievance against Walls alleging he "harassed and disrespected" her in retaliation for her prior complaints.[67]  She was upset that she was not placed in the acting Manager role and complained that Walls was holding her back from assuming some of Molletta's responsibilities, such as interviewing applicants for Café positions.[68]  Peace also took issue with Walls' frequent questioning regarding how long she spent on breaks away from the Café and his counseling against

---

[64]  *Id.* at A7.
[65]  D.I. 67 at A295-96.
[66]  *Id.* at A98-300.
[67]  *Id.* at A152.
[68]  *Id.* at A153.

physical "rough-housing" with another employee.[69]  Peace testified that she only left the Café area for allotted breaks or work-related errands.[70]

Jim Johnson (the DRBA's Executive Director) responded to Peace's grievance in a letter dated August 13, 2007.[71]  Peace did not receive this letter.[72]  Johnson, Petty-Judkins, Spence-Parker, and Andrew Ritchie (the DRBA's Human Resources Manager) met with Peace on August 23 to discuss the grievance further.[73]  Johnson informed Peace that Ritchie and Petty-Judkins would investigate her complaint.  Richie and Petty-Judkins interviewed Walls and Peace separately on September 6, and sent Johnson a report on October 18 detailing their conclusions and recommendations.[74]  They determined that Walls had legitimate reasons for not placing Peace in the acting Manager position unrelated to her race or previous complaints.[75]  They also found that Walls had the "authority and obligation to inquire about [Peace's] whereabouts during the café business hours."[76]  The two further concluded that, while Peace was not always clear on Walls' direction, any lapses in communication were not the result of race discrimination or harassment on his part.[77]  Johnson concurred with these findings in a letter to Peace on October 28, 2007.[78]

On January 14, 2008, the DRBA formally posted the permanent Manager

---

[69]  *Id.* at A153-154.
[70]  D.I. 69 at A106-12.
[71]  D.I. 67 at A158.
[72]  *Id.*
[73]  *Id.*
[74]  *Id.*
[75]  *Id.* at A161.
[76]  *Id.* at A160.
[77]  *Id.* at A161.
[78]  *Id.* at A163-64.

opening with an application closing date of February 4, 2008.[79]  Both Peace and Cattalo

interviewed for the position.[80]  Dana Herbert, a black male from outside the Authority,

was ultimately selected for the post.[81]  On March 31, 2008, he began work as Peace's

direct supervisor.[82]

      Peace testified that she has been shunned by DRBA management since July

2008, even when she has work-related questions.[83]  Peace argues this neglect has

made it difficult to perform her job duties.  Specifically, she asserts that management's

reluctance to address her concerns about understaffing at the Café has required her to

continue filling in as cook and cashier, which Herbert agrees would be inappropriate on

a full-time basis.[84]

## III.  DISCUSSION

### A.  Standard on Motion for Summary Judgment

      Under Rule 56(c) of the Federal Rules of Civil Procedure, a court is to enter

summary judgment only when the record demonstrates that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law.  In

deciding a motion for summary judgment, the court's role is not to weigh the evidence or

to determine the truth of the matters asserted, but to determine whether there is a

genuine issue of fact for trial.[85]  In so doing, the court must view all facts and draw all

---

[79] *Id.* at A166.
[80] *Id.* at A234.
[81] *Id.* at A192-93.
[82] *Id.*
[83] D.I. 68 at A132-34.
[84] *Id.* at A134-35.
[85] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)

reasonable inferences in favor of the non-movant, take as true all allegations of the non-movant that conflict with those of the movant, and resolve all doubts against the movant.[86]  The court must also treat direct and circumstantial evidence alike.[87]

## B.  Title VII Discrimination [88]

Peace claims Title VII discrimination through a hostile work environment.  To state a claim for a hostile work environment, Peace must show that:  (1) she suffered intentional discrimination because of race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same race in her position; and (5) the existence of vicarious liability.[89]

The DRBA argues that Peace cannot establish severe or pervasive discrimination as a matter of law.  In determining whether the severe or pervasive element is satisfied, courts look to the totality of the circumstances, including such factors as the frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.[90]  Overt racial harassment is not necessary to

---

[86]  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985).

[87]  *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003).

[88]  The relevant portion of 42 U.S.C. § 2000e-2(a) states that it shall be unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."

[89]  *Aman v. Cort Furniture Retail Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996).

[90]  See *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Nieves v. Acme Markets, Inc.*, 541 F. Supp. 2d 600, 606 (D. Del. 2008).

establish a hostile environment.[91]  Peace need only show that race played a substantial role in the harassment and that she would have been treated more favorably had she been white.[92]  That said, courts in this circuit have frequently required at least some overt racially hostile words or conduct to signal the invidious nature of facially neutral conduct.[93]  An employee's subjective belief that she suffered severe or pervasive treatment, without more, is not enough to survive summary judgment.[94]

The DRBA takes a fragmented view of Peace's allegations, arguing that only three comments reported by Peace directly implicate her race.  These are:  (1) a comment Peace overheard that "blacks would have been hung for things like this"; (2) a third-hand report that Wise and Wallace felt there were too many blacks working in the Café; and (3) the anonymous sign suggesting that, without Peace in the Café, white employees were "free at last."  The Third Circuit has made clear, however, that the discrimination analysis "must concentrate not on individual incidents, but on the overall scenario."[95]  This court, therefore, must also consider Peace's other allegations of

---

[91]  *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir. 1990).

[92]  *Id.*

[93]  *See Brooks v. CBS Radio, Inc.*, Civ. No. 07-0519, 2007 WL 4454312, at *11 (E.D. Pa. Dec. 17, 2007) (analyzing *Cardenas v. Massey*, 269 F.3d 251 (3d Cir. 2001) and *Caver v. City of Trenton*, 420 F.3d 243 (3d Cir.2005)); *Santana v. State of Del. Dep't of Health &  Soc. Servs.*, Civ. No. 06-666 GMS, 2008 WL 399639, at *4 (D. Del. Feb. 13, 2008) (citing *Brooks* approvingly).

[94]  *See Douglas v. United Serv. Auto Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996); *see also McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 436-37 (3d Cir. 2007) ("[T]o survive summary judgment, a party must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue.") (quoting *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005)); *In re Phillips Petroleum Securities Litigation*, 881 F.2d 1236, 1243 (3d Cir. 1989) ("[P]laintiff may not simply rest upon his bare allegations . . . rather, he must present 'significant probative evidence tending to support the complaint.'") (quoting *Anderson*, 477 U.S. at 249).

[95]  *Andrews*, 895 F.2d at 1484.

facially neutral conduct (including physical contact and humiliation) and racially suggestive conduct not directly targeting Peace (including offensive language and slurs).  If a reasonable jury found this combination of direct, indirect, and facially neutral conduct connected, it could also reasonably find that Peace suffered severe or pervasive discrimination at the DRBA.  Summary judgment is therefore inappropriate at this stage of the prima facie analysis.

The DRBA also argues that Peace's prima facie case fails to establish vicarious liability.  The basis of an employer's liability for a hostile work environment depends on whether the harasser is the victim's supervisor or merely a coworker.[96]  When a hostile work environment is created by an employee's non-supervisory coworkers, employer liability exists only if:  (1) the employer failed to provide a reasonable avenue for complaint; or (2) the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action.[97]  When the hostile environment is created by a supervisor, courts must ask whether the employee was subject to a tangible employment action.  If not, the employer may avoid liability through an affirmative defense that: (1) it exercised reasonable care to prevent and promptly correct any harassing behavior; and (2) that the employee unreasonably failed to take advantage of the employer's safeguards or to otherwise avoid harm.[98]  No defense is available if the supervisor's harassment constitutes a tangible employment action.[99]

---

[96] *See Huston v. Procter & Gamble Paper Products Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).

[97] *Id.* (citing *Weston v. Pennsylvannia*, 251 F.3d 420, 427 (3d Cir. 2001)).

[98] *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

[99] *Id.*

The Supreme Court has defined a tangible employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[100]  Such actions usually, but need not, inflict direct economic harm.[101]

Even if an employer's investigation into a harassment complaint is deficient, it cannot be held liable for a hostile work environment unless its subsequent remedial action is also lacking.[102]  In determining whether a remedial action is adequate, courts ask whether it was "reasonably calculated" to prevent further harassment.[103]  Prompt and effective action by the employer in response to an employee's complaint necessarily meets this test.[104]  Yet an employer's action may be "reasonably calculated" even if not ultimately effective.[105]  Moreover, if an employer's response to a complaint is adequate, the aggrieved employee cannot object to the selected action or mandate that the employer take a different one.[106]

Peace cannot establish liability as to her supervisors' conduct in this case because she cannot demonstrate that they intentionally discriminated against her.  As Peace does not argue that either Walls or Iannetta subjected her to "pervasive"

---

[100]  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

[101]  *Id.* at 762.

[102]  *Knabe v. Boury Corp.*, 114 F.3d 407, 412 (3d Cir. 1997).

[103]  *See Id.*; *accord Huston*, 568 F.3d at 110.

[104]  *See Bouton v. BMW of N. Am., Inc.*, 29 F.3d 103, 110 (3d Cir. 1994) ("By definition, there is no [employer] negligence if the [complaint] procedure is effective."); *Andreoli v. Gates*, 482 F.3d 641, 644 n.2 (3d Cir. 2007) ("[A] remedial action that stops the harassment is adequate as a matter of law.").

[105]  *See Andreoli*, 482 F.3d at 644 (3d Cir. 2007); *Moore v. City of Philadelphia*, 461 F.3d 331, 350 (3d Cir. 2006).

[106]  *See Knabe*, 114 F.3d at 414.

discrimination, she must provide evidence of "severe" discrimination in the form of tangible employment actions.  Peace's efforts to demonstrate the tangibility of her supervisor's actions, however, fail to show how a reasonable jury could connect those actions to a discriminatory motive.  Indeed, the record is devoid of any overt racial conduct by her supervisors.  To prove that race influenced Iannetta in temporarily assigning Peace to full-time cooking and cashiering,[107] for example, Peace offers an incident in which he loudly criticized her and Molletta in a public place.  But Peace does not claim that this reprimand included any racially suggestive language.[108]  In the same vein, Iannetta's prior remark that white employees might not be "used to the change" associated with black supervision shows only his *awareness* of racial discord at the Café, not sympathy with its alleged perpetrators.  Similarly, Peace asserts that Walls' "sudden, intense scrutiny" following Molletta's departure reveals racial animus in later denying her the acting Manager position, but she does not dispute that Walls' temporary assignment to oversee Café operations in Molletta's absence *obligated* him to scrutinize her more closely.  Nor does Peace establish a discriminatory motive lurking behind Walls' bagful of experience- and performance-based reasons for the acting Manager decision simply by asserting a spotless attendance record.

While this court will not hold the DRBA liable for the actions of its supervisors, it could nonetheless be culpable for failing to adequately respond to harassment by Peace's coworkers.  Yet when Peace complained about coworker harassment at the

---

[107]  It is worth noting that Peace knew assisting with cooking and cashiering was part of her job, and that in three and a half years of employment she has alleged spending no more than seven months in these assignments.

[108]  *See* D.I. 68 at A52-54.

DRBA, the uncontroverted record reflects a measured response to a serious concern. Wise, who Peace knew to have made racially offensive statements to others, was cautioned about the tension surrounding Susan Clayton and formally reprimanded in her annual performance review.  Kennedy, whose conduct had no connection to race apart from her friendship with Moriarty, was also warned that the DRBA would not tolerate her actions.  Gilbert, whom Peace never officially reported, was removed from the Café schedule and transferred to another work location.  When a sign with clear racial implications was anonymously posted in the Café, Walls and Spence-Parker immediately dispatched Petty-Judkins to conduct a preliminary investigation, interview witnesses, and prepare a formal report within the week.  When animosity surfaced between Peace and Moriarty, the DRBA transferred Moriarty to another post outside the Café.  Peace makes much of the fact that her own complaint against Moriarty was not formally heard for months, but the DRBA promptly addressed the substance of her complaint by immediately separating the two, and Peace reported no further problem with Moriarty after this action was taken.  The DRBA also revised its Complaint and Harassment Policy to be more responsive after Peace registered her aggravation with the process.

To be sure, at some point a series of incidents requires more than a series of *ad hoc* remedies, but Peace does not dispute that the DRBA took proactive measures to combat harassment in the Café, as well.  In April 2006, before Peace's complaint against Moriarty had been addressed by the Harassment Committee, Walls instituted weekly meetings with Café supervisors to quickly bring such incidents to light.  The DRBA also provided Iannetta, Peace, and Molletta with third-party counseling, and

organized regular meetings for Peace and Molletta with a human resources representative to discuss any emerging problems.  When Peace suggested the DRBA go further and conduct diversity training, the DRBA mandated diversity training *and* anti-harassment classes for all its employees.  In sum, no reasonable jury could disagree that the DRBA made a genuine effort to promptly address and eliminate racial harassment in the Café.  For this reason, summary judgment should be granted to the DRBA on Peace's hostile work environment claim.

## C.  Title VII Retaliation

Peace claims Title VII Retaliation through a pretext theory, which must survive a burden-shifting inquiry similar to that propounded in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[109]  The initial burden in this inquiry rests with Peace to establish a prima facie case of retaliation by showing that:  (1) she engaged in activity protected by Title VII; (2) the DRBA took a materially adverse employment action against her; and (3) there is a causal connection between her participation in the protected activity and the DRBA's adverse action.[110]  A materially adverse action is one that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."[111]  A causal connection between protected activity and adverse action may be inferred from:  (1) an unusually suggestive temporal proximity between the two; (2) an intervening pattern of antagonism following the protected conduct; or (3) the

---

[109]  *Schatzman v. Martin Newark Dealership, Inc.*, 158 F. Supp. 2d. 392, 402 (D. Del. 2001).

[110]  See *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 320 (3d Cir. 2008) (citing *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006)).

[111]  *Burlington Northern and Sante Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

proffered evidence examined as a whole.[112]

If Peace establishes a prima facie case, the burden shifts to the DRBA to advance a legitimate, non-retaliatory reason for its action.[113]  The burden at this stage is relatively light.  It is satisfied if the DRBA articulates any legitimate reason; it need not prove that the articulated reason actually motivated the action.[114]  If the DRBA provides such a reason, the burden returns to Peace to produce show pretext, *i.e.*, some evidence from which a factfinder could reasonably either (1) disbelieve the DRBA's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the DRBA's action.[115]  This requires Peace to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[116] Peace need not discredit *all* of the DRBA's articulated reasons, only enough of them to impede the DRBA's credibility with a rational factfinder as to the remainder.[117]

Although a hostile work environment can constitute a materially adverse action, vicarious liability remains necessary to establish a hostile work environment.[118]

---

[112]  *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).
[113]  *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997) (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997)).
[114]  *See Woodson*, 109 F.3d at 920 n.2 (3d Cir. 1997) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).
[115]  *See Fuentes*, 32 F.3d at 764.
[116]  *Id.* at 765 (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir.1992)) (internal quotations omitted).
[117]  *See id.* at 764 n.7.
[118]  *See Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *overruled on other grounds by Burlington Northern*, 548 U.S. 53 (2006).

Because Peace has failed to demonstrate vicarious liability for a hostile work environment, she must rely on other employment actions to demonstrate material adversity in her retaliation claim.  Peace suggests two plausibly material actions, but fails to establish a claim for either.  The first–reassignment to full-time cooking and cashiering duties–lacks causality.  The cooking assignment can have no casual connection to retaliation because it predated all of Peace's protected activities.  As to cashiering, Peace was assigned full-time responsibilities in February 2007, eight months after her most recent documented complaint to the Harassment Committee in June 2006.  Without other evidence of an invidious motive, however, this attenuated link is insufficient to establish causality.[119]  Peace's prima facie retaliation case as to these assignments, therefore, fails as a matter of law.

The second action Peace alleges to be materially adverse is Walls' refusal to designate her acting Food and Retail Manager after Molletta's resignation.  There is stronger temporal evidence in this regard, as Peace complained about the "free at last" sign less than a month before Walls told her she would not be considered for the position.  Peace also alleges a pattern of "sudden, intense scrutiny" from Walls

---

[119] *Compare Robinson v. Southeastern Pa. Trans. Auth., Red Arrow Div.*, 982 F.2d 892, 894-95 (3d Cir. 1993) (expressing doubt that near two-year gap between protected activity and discharge could establish causal link absent an intervening pattern of antagonism) *with Jalil v. Avdel Corp.*, 893 F.2d 701, 708 (3d Cir. 1989) (finding interval of two days between employee's EEOC complaint and discharge sufficient to create an inference of causation); *see also Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997) (confining the holding in *Jalil* to its "unusually suggestive facts"); *Urey v. Grove City Coll.*, 94 Fed. Appx. 79, 81 (3d Cir. 2004) (noting that where at least four months passed after protected action without employer reprisal, no inference of causation is generally created) (citing *Woods v. Bentsen*, 889 F. Supp. 179, 187 n.15 (E.D. Pa. 1995) (collecting cases)).

beginning shortly before he made his decision.  Even assuming this evidence sufficient to establish a causal link, however, Peace fails to answer Walls' legitimate, non-retaliatory explanations for his actions.  Walls presented evidence that he was temporarily assigned to oversee Café operations after Molletta left the DRBA, and that he had no such managerial responsibility prior to her resignation.  Peace does not explain why, in light of these facts, Walls' increased vigilance in the Café should nonetheless be considered retaliatory.  More importantly, Walls provided a number of performance- and experience-based reasons for the acting Manager decision.  Peace argues these reasons are pretextual by stating that she only left the Café on scheduled breaks and work-related errands.  While this argument undercuts Walls' assertion that Peace had a spotty attendance record, it does nothing to rebut his concerns about her lack of initiative or retail restaurant experience.  In particular, Walls has shown that the successful applicant (Michael Cattalo) had 20 years of experience as a general manager at three different public restaurants and bars.  Indeed, Cattalo's resume documents a background in skills (such as inventory control, payroll and reconciliation reports, sales projections, and cost analysis) *directly* applicable to the financial problem areas Walls sought to ameliorate.[120]  Considering Peace has not even alleged a comparable work history or skill set, no reasonable jury could discredit Walls' testimony that the business needs of the Café disqualified Peace for the position.[121]

---

[120]  *See* D.I. 67 at A172-73.
[121]  *See id.* at A295-98.

**D.  Title VII Failure to Promote**

Peace argues Walls' decision not to offer her the acting Food and Retail Manager position establishes a claim for failure to promote.  Under Title VII, these claims are also subject to the *McDonnell Douglas* burden-shifting analysis.  To state a prima facie case for failure to promote, Peace must show that:  (1) she belongs to a racial minority; (2) she applied and was qualified for a job for which the DRBA was seeking applicants; (3) despite her qualifications, she was rejected; and (4) after her rejection, the position remained open and the DRBA continued to seek applicants from persons of her qualifications.[122]  If Peace establishes a prima facie case, the burden shifts to the DRBA to articulate some legitimate, nondiscriminatory reason for its rejection.[123]  Should it do so, the burden returns to Peace to demonstrate pretext in the same manner as discussed above with respect to retaliation.

Third Circuit caselaw is unclear as to whether the fourth prong of the prima facie analysis requires Peace to show only that she had the minimum qualifications required for the job, or that she was at least as qualified as Catallo.[124]  Even under the more lenient standard, however, Peace must establish that she was qualified enough to be

---

[122]  *See McDonnell Douglas*, 411 U.S. at 802.

[123]  *See id.*

[124]  *Compare Ezold*, 983 F.2d at 523 (holding that attorney who claimed she was passed over for law firm partnership because of her gender need only show at prima facie stage that "[s]he was sufficiently qualified to be among those persons from whom a selection . . . would be made" (citation omitted)) *with Jewett v. Int'l Tel. & Tel. Corp.*, 653 F.2d 89, 91 (3d Cir.1981) (holding in failure-to-promote context that plaintiff failed to make out prima facie case because person who was promoted had "superior qualifications"); *see also Taylor v. Cherry Hill Bd. of Educ.*, 85 Fed. Appx. 836, 839-40 (3d Cir. 2004) (recognizing the ambiguity but declining to resolve it).

among those considered for the relevant position.[125]  As discussed above, Walls has demonstrated that he needed the acting Manager to have retail experience and a background in financial and cost analysis, and that he was unwilling to consider applicants without it.  Because Peace provides no evidence of comparable experience or skills, she cannot establish a prima facie case and summary judgment should be granted to the DRBA.

## E.  Section 1981

Peace further asserts a claim against the DRBA under 42 U.S.C. § 1981, which provides that "all persons . . . shall have the right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings . . . as is enjoyed by white citizens."  The substantive elements of section 1981 claims are generally identical to those of employment discrimination under Title VII.[126]  Because Peace has failed to establish a violation of Title VII, the DRBA should be granted summary judgment on her section 1981 claims as well.

## F.  Individual Defendant James Walls

In addition to her claims against the DRBA, Peace asserts a discrimination claim against Walls in his individual capacity under 42 U.S.C. § 1983.[127]  To properly assert a

---

[125]  *See id.*

[126]  *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009) (citing *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 499 (3d Cir.1999)).

[127]  The relevant portion thereof reads: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper

section 1983 claim, Peace must allege (1) a violation of a right secured by the

Constitution and laws of the United States, and (2) that the alleged deprivation was

committed by a person acting under color of state law.[128]  Because Peace's allegations

fail to establish violation of a constitutional right, Walls' motion for summary judgment on

Peace's section 1983 claim should also be granted.

## IV.  CONCLUSION

For the reasons stated above, defendants' motions for summary judgment are

GRANTED in full.

---

proceeding for redress."
    [128]  *West v. Atkins*, 487 U.S. 42, 48 (1988).